PATRICK A. COCKEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cockey v. Commissioner
Docket Nos. 25336-82, 25337-82.
United States Tax Court
T.C. Memo 1985-336; 1985 Tax Ct. Memo LEXIS 295; 50 T.C.M. (CCH) 372; T.C.M. (RIA) 85336; July 10, 1985. *295 Held, petitioner is liable for deficiencies in personal income tax for the years 1973, 1974, and 1975 as determined by respondent. Held further, petitioner is also liable for the addition to tax under sec. 6653(b), I.R.C. 1954, for each of those years. Held further, petitioner, as transferee, is liable for deficiencies in corporate income tax of Champs Outboard Sales and Service, Inc. (Champs), as determined by respondent. Held further, petitioner, as transferee of Champs, is not liable for the addition to tax under sec. 6653(b) for the year 1974. Held further, petitioner, as transferee of Champs, is liable for the addition to tax under sec. 6651(a) for the year 1975. Patrick A. Cockey, pro se. Elizabeth S. Henn, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By notice of deficiency dated July 20, 1982 in docket No. 25337-82, respondent determined that petitioner was liable for deficiencies in personal income tax and additions to tax under section 6653(b), I.R.C. 1954, for the years 1973, 1974, and 1975 in the following amounts: Addition to tax
Year
Deficiency
under sec. 6653(b)
1973
$15,301.95
$7,650.98
1974
8,600.63
4,300.32
1975
9,045.00
4,522.50
By *296 separate notice of deficiency dated July 20, 1982 in docket No. 25336-82, respondent determined that petitioner, as transferee of the assets of Champs Outboard Sales and Service, Inc. (hereinafter referred to as Champs), was liable for deficiencies in corporate income tax and additions to tax under sections 6651(a) and 6653(b) for the years 1974 and 1975 in the following amounts: Addition to tax under
Year
Deficiency
sec. 6651(a)
sec. 6653(b)
1974
$2,004.76
$1,002.40
1975
182.21
$45.55
These cases were subsequently consolidated for purposes of trial, briefing, and opinion. Petitioner has stipulated to be bound by this Court's decision in Cockey v. Commissioner,T.C. Memo. 1983-609, that he is liable as a transferee for any resulting income tax deficiencies and additions to tax of the transferor corporation, Champs. The issues for decision are: (1) whether, and if so to what extent, petitioner is liable for deficiencies in personal income tax for the years 1973, 1974, and 1975; (2) whether petitioner is liable for the addition to tax under section 6653(b) for the years 1973, 1974, and 1975; (3) whether, and if so to what extent, there are deficiencies in the corporate income tax of Champs for *297 the years 1975 and 1975; (4) whether petitioner, as transferee, is liable for an addition to tax under section 6653(b) for the year 1974; and (5) whether petitioner, as transferee, is liable for an addition to tax under section 6651(a) for the year 1975. FINDINGS OF FACT With the exception of the above-referenced stipulation, none of the facts have been stipulated. At the time he filed his petitions herein, petitioner resided in Stevensville, Maryland. Petitioner did not file personal income tax returns for the years 1973, 1974, and 1975. Champs did not file corporate income tax returns for the years 1974 and 1975. During the years 1973 through 1975, petitioner was a 50-percent stockholder in Champs. His now former spouse, Gladys Cockey, owned the remaining 50-percent of the corporation's stock. Champs was in the business of selling and repairing boats. Petitioner also was a 100-percent stockholder in Lykeki Inc. (hereinafter Lykeki), whose primary business was the wholesale distribution of boats to dealers. Petitioner was married to Gladys Cockey during all of the years in issue. The couple was separated in September 1974. Gladys Cockey sued petitioner for a divorce in the *298 Circuit Court for Anne Arundel County. In January 1975 the state court enjoined petitioner from spending any monies or disposing of any property of Champs of Lykeki other than that which was absolutely essential for the operation of the businesses. In May 1975 petitioner left the country and sailed to the Caribbean on a Hatteras yacht. Prior to that time, petitioner was the person primarily responsible for the operation and management of both Champs and Lykeki. After petitioner left the country in May 1975, the state court appointed Gladys Cockey receiver for Champs and Lykeki. In early 1976 the assets of Champs were sold, and the net proceeds from the sale, after the payment of debts, totaled $38,205.01. By order dated May 26, 1976, the state court permitted Gladys Cockey to withdraw $19,102.51 from the corporation, representing her one-half of the net sales proceeds. Petitioner returned to the country in April 1976. On October 4, 1976 petitioner and Gladys Cockey entered into a property settlement agreement pursuant to the divorce action. This agreement stated that petitioner owed various amounts of money to Gladys Cockey as a result of his failure to pay child support from *299 April 1, 1975 to the date of the agreement. It also acknowledged therein that certain corporate assets had been reduced to the possession and control of petitioner without the permission of Gladys Cockey. In recognition of these and other obligations, petitioner agreed to assign to Gladys Cockey any right, title, and interest he might have to the remaining proceeds from the sale of Champs' assets. Petitioner's Personal Liability
Petitioner filed income tax returns for the taxable years 1969 through 1972. Petitioner's personal tax returns normally were prepared by an accountant, Leon S. Braunstein. Petitioner delivered his income tax information to Mr. Braunstein, who then prepared petitioner's returns. After the returns were prepared, petitioner signed them and mailed them to the IRS. In 1974 Mr. Braunstein called petitioner several times to secure the information needed to prepare petitioner's 1973 return. However, petitioner did not file a personal income tax return for that year; nor did he file returns for 1974 or 1975. Petitioner knew that he had sufficient income to require the filing of returns for 1973, 1974, and 1975. Petitioner received taxable wages from Champs in *300 1973, 1974, and 1975 in the respective amounts of $30,200, $18,200, and $7,000. Petitioner knew that he had such income and received statements of his wages from Champs for those taxable years. [1]
In August or September 1975 Special Agent Donald Temple commenced a criminal investigation of petitioner. He attempted to contact petitioner but learned that petitioner was out of the country. The Criminal Investigation Division requested the assistance of Revenue Agent Raymond Hull from the Examination Division. After petitioner returned to the country, Temple and Hull conducted three interviews with him, the first one occurring in September 1976. In June 1980 petitioner was convicted of one count of willful failure to file an income tax return for the taxable year 1973, in violation of section 7203, and was sentenced to 30 days' imprisonment and 2 years' probation, *301 with the condition that petitioner perform 200 hours of community service. In the course of their investigations, the agents determined that petitioner had diverted a rather substantial amount of corporate assets of Champs and Lykeki to his own personal use. In 1973 petitioner deposited a $5,500 check into his personal savings account. The check represented payment received on the sale of a boat called "Old Leaky," which the agents determined had been carried in Lykeki's inventory. In addition, Lykeki sold another boat in 1973, receiving a Ford LTD in payment therefor. The automobile was used by petitioner's daughter. However, it was registered with the Maryland Department of Transportation in petitioner's name. The registration form showed a purchase price of $1,100. On its 1973 corporate income tax return, Champs claimed a travel expense deduction of $1,062.75. Said deduction was disallowed for lack of substantiation in Cockey v. Commissioner,T.C. Memo. 1983-609. Since the agents could not determine what this particular item was attributable to, but did determine that petitioner received this item, they considered it a dividend to him from Champs. In 1974 petitioner bought *302 a motorcycle for his son, using a check in the amount of $740.40 drawn on the account of Lykeki to pay for the purchase. Petitioner wrote "sub-contract freight" at the bottom of the check. In December 1974 petitioner purchased a Hatteras yacht for his personal use with funds drawn on the bank account of Lykeki. The agents determined that petitioner had used Lykeki's bank account to pay for numerous personal expenses. They determined that he had received $11,797.32 from Lykeki in 1974, which amount represented the excess of all monies withdrawn from Lykeki's account for petitioner's personal use over the amounts of money that petitioner had put into the business of Lykeki from his personal accounts. The agents' determination of the amounts of money that petitioner had put into Lykeki's business was based on statements made by petitioner during the interviews and a subsequent verification of those statements from an examination of bank records. Lykeki paid various personal expenses of petitioner in 1975, as well. For example, the corporation paid approximately $565 to Engines Unlimited for work done on petitioner's personal yacht. In addition, Lykeki paid approximately $437 to Edgewater *303 Yacht Club for docking petitioner's yacht. The agents determined that petitioner had received $1,417.99 from Lykeki in 1975, which amount represented the excess of all monies withdrawn from Lykeki's account for petitioner's personal use over the amounts of money that petitioner had put into the business of Lykeki from his personal accounts. Between January and May 1975, petitioner diverted approximately $19,055 from Champs. The money was diverted by selling various assets of Champs and converting the cash proceeds to petitioner's own benefit. For example, prior to leaving the Caribbean, petitioner instructed someone to sell a Cadillac owned by Champs. The Cadillac was sold for approximately $5,000, and the proceeds were then sent to petitioner in the Caribbean. In addition, Champs sold a boat to a Mr. Jenkins for $7,155. According to petitioner, he kept this amount for his personal use. Based on an examination of Champs' bank account, the agents determined that petitioner actually retained only $6,055 of the $7,155 purchase price and deposited the remainder of the purchase price into Champs' bank account. Petitioner also received a $1,000 cash payment from a Mr. Ott for the repair *304 of a boat by Champs in May 1975. Just before he left the country, petitioner sold a 19-foot Drummond boat owned by Champs to a Mr. Plews for $6,200. Petitioner took the cash received from Mr. Ott and Mr. Plews with him when he left the country. In his notice of deficiency respondent determined that petitioner had received wages, dividend income from either Lykeki or Champs or both, and miscellaneous items of income, primarily interest, for each of the years in issue. Respondent also determined that all or a part of the underpayments of tax was due to fraud and accordingly asserted the addition to tax under section 6653(b) for each of those years. Transferee Liability
Champs filed corporate income tax returns for the years 1972 and 1973. Both returns were signed by petitioner. Petitioner had a 1974 corporate return prepared for Champs in January 1975 by an organization called Pro-Tax. The return was prepared from information provided by petitioner and showed a taxable loss of $40,412. However, this return was never filed but, instead, was turned over to the state court before which Gladys Cockey's divorce action was pending. Because the books and records of Champs were not *305 sufficient to determine income, Revenue Agent Hull used a modified bank deposits method to reconstruct Champs' income for 1974 and 1975. An analysis of Champs' bank account revealed to him that there were total deposits of $374,256.04 in 1974, of which $23,713.01 represented nontaxable deposits, [2] *306 leaving a balance of 350,543.03. Champs' used the accrual method of accounting in keeping its books and records. Based on an analysis of Champs' books and records, Hull determined that there was an accounts receivable balance at the end of 1973 in the amount of $2,908.36 and an accounts receivable balance at the end of 1974 in the amount of $1,422.27. To adjust for income that might have been received in 1974 (and therefore calculated in the total deposits), but accrued in 1973, Hull subtracted the accounts receivable balance at the close of 1973 from the gross receipts. To adjust for income that was accrued in 1974, but not yet received, Hull added the accounts receivable balance at the end of 1974 to the gross receipts. He determined that Champs had total gross receipts of $349,056.94 for 1974 after adjustments for nontaxable deposits and accounts receivable. With respect to the year 1975, Hull determined, based on an analysis of Champs' bank acounts, that there were gross deposits of $37,205.26, of which $13,278.85 represented nontaxable deposits. [3] *307 Hull then subtracted the accounts receivable balance at the close of 1974 of $1,422.27 from the gross receipts, because he had included such amount in Champs' taxable income for 1974. In addition to the bank deposits, Hull determined that Champs had various other items of income that had never been deposited into Champs' bank accounts. The transactions giving rise to this additional income included the following: (1) the sale of a boat to a Mr. Bernard for $3,195, (2) $1,000 of repair work done for Mr. Ott, (3) the sale of a boat to Mr. Jenkins for $6,055, [4] (4) the sale of a boat to Mr. Plews for $6,200, and (5) $1,107.92 of gain on the sale of a Cadillac. Hull determined that Champs' gross receipts for 1975, after adjustments for nontaxable deposits, the 1974 year-end accounts receivable, and the additional income not deposited, amounted to $40,062.06. In his notice of deficiency sent to petitioner as transferee of Champs, respondent determined that Champs had gross receipts of $349,056.94 and $40,062.06 in 1974 and 1975, respectively. [5] He further determined that Champs had a cost of goods sold of $257,526.95 and $24,321.72 and other business deductions of $81,421.11 and $24,530.78 in 1974 and 1975, respectively. With respect to Champs' 1974 taxable year, respondent determined a deficiency of $2,004.79 and an addition to tax for fraud of $1,002.40 under section 6653(b). With respect to Champs' 1975 taxable year, respondent determined that Champs had an overall loss of $8,790.44; however, *308 he determined a deficiency of $182.21, resulting from the recomputation of a prior year's investment credit and also determined an addition to tax for failure to timely file a return of $45.55 under section 6651(a). OPINION Personal Liability
Deficiencies
a. 1973
Respondent determined that during his 1973 taxable year, petitioner received $30,200 of wages from Champs, $1,062.75 of dividends from Champs, $6,600 of dividends from Lykeki, and other income in the amount of $7,137.41, made up of interest income and an unexplained deposit. Petitioner agrees that he received taxable wages of at least $30,200 from Champs for the year 1973. In addition, judging from his silence on the matter, petitioner apparently does not dispute that he received "other income" in the amount of $7,137.41. Respondent's determination of dividend income from Champs is based *309 on his disallowance of a travel expense deduction claimed by Champs in 1973, which disallowance was upheld by this Court in Cockey v. Commissioner,T.C. Memo. 1983-609. Respondent's determination of dividend income from Lykeki is based on his determination that petitioner diverted $6,600 from that corporation in 1973. The $6,600 figure is comprised of a $5,500 payment received directly by petitioner from the sale of a boat, "Old Leaky," carried in Lykeki's inventory and of an asserted $1,100 fair market value of a Ford LTD received by petitioner in 1973 as payment on the sale of a boat owned by Lykeki. Under sections 301(a) and (c)(1) and 316, a distribution of rpoperty made by a corporation to a shareholder generally is includable in the shareholder's gross income as a dividend to the extent of the corporation's earnings and profits. It is well settled that payments by a corporation for the personal benefit of a shareholder may result in the receipt by the shareholder of a constructive dividend. Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 663 (1962). Moreover, where a controlling shareholder diverts corporate income to himself, it is proper to regard such diverted *310 funds as constructive dividends for tax purposes. Dawkins v. Commissioner,238 F.2d 174, 178 (8th Cir. 1956); Currier v. United States,166 F.2d 346, 348 (1st Cir. 1948); Chesbro v. Commissioner,21 T.C. 123, 129 (1953), affd. 225 F.2d 674 (2d Cir. 1955), cert. denied 350 U.S. 995 (1956). The burden of proving that the corporation did not have earnings and profits sufficient to support diidend treatment lies with petitioner. DiZenzo v. Commissioner,348 F.2d 122, 126-127 (2d Cir. 1965). With respect to respondent's determination that the disallowed travel expense deduction constitutes a constructive dividend to petitioner, we think it important to note that our prior decision upholding respondent's disallowance of the deduction was based on a failure to substantiate the deduction as required by section 274(d). Cockey v. Commissioner,T.C. Memo. 1983-609. The disallowance to a corporation of a claimed travel expense deduction for failure to substantiate the expense under section 274(d) does not necessarily mean that such expense will be treated as a constructive dividend. Palo Alto Town & Country Village, Inc. v. Commissioner,565 F.2d 1388, 1391 (9th Cir. 1977). The test for constructive *311 dividends in such circumstances is twofold; not only must the expenses be nondeductible to the corporation, but they must also represent some economic gain or benefit to the shareholder. Palo Alto Town & Country Village, Inc. v. Commissioner,supra at 1391; see also United States v. Gotcher,401 F.2d 118, 121-124 (5th Cir. 1968). Petitioner herein has the burden of proving erroneous respondent's determination that the disallowed deduction claimed by Champs constitutes a constructive dividend to petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure.[6] Petitioner presented absolutely no evidence to refute the asserted dividend or to establish that Champs did not have sufficient earnings and profits available for a dividend. Accordingly, under the circumstances we have no choice but to hold that petitioner has failed to carry his burden of proof on this matter. With respect to the $5,500 constructive dividend determined by respondent in connection with the sale of "Old Leaky," petitioner admits that he deposited the $5,500 of sales proceeds into his personal account, but maintains that the boat *312 was a personal boat owned by petitioner himself and that respondent failed to give him credit for his cost basis. However, aside from his self-serving and somewhat unclear testimony, petitioner failed to produce any evidence to rebut respondent's determination that "Old Leaky" was carried in Lykeki's inventory. Moreover, petitioner's self-serving statements with respect to the cost of building "Old Leaky" were inconsistent. During one of his interviews with Hull and Temple, petitioner stated that he purchased the materials to build the hull of the boat at a cost of approximately $100 and that he paid nothing for labor. He further stated that the pump that was put into the boat was taken out of another boat and had a wholesale cost of $500; that the engine in the boat was a Chevrolet race engine received on a trade for a boat owned by Lykeki; and that the seat in "Old Leaky" was a racing seat taken out of a boat that Lykeki had purchased. However, petitioner testified that "[i]t probably cost in excess of $7,000 to build the boat," and, on brief, he asserted that the cost of materials alone exceeded $7,000. Petitioner produced no evidence whatsoever to support his various assertions *313 relating to the cost of "Old Leaky." At any rate, to the extent that the $5,500 proceeds from the sale of that boat constituted a constructive dividend to petitioner, as asserted by respondent, the cost of "Old Leaky" is irrelevant. The amount of any distribution to a noncorporate shareholder, for purposes of section 301, is the amount of money received by the shareholder, plus the fair market value of any other property received by the shareholder. Section 301(b)(1)(A). Thus, Lykeki's basis in "Old Leaky," whatever that may be, cannot be offset against the amount of any constructive dividend properly chargeable to petitioner. With respect to the $1,100 constructive dividend asserted by respondent in connection with petitioner's receipt of a Ford LTD as payment on the sale of a boat owned by Lykeki, petitioner admitted at trial that the automobile was used by his daughter for personal purposes. The registration documents filed by petitioner with the Maryland Department of Transportation indicated that the purchase price of the automobile was $1,100. Petitioner testified that he reimbursed the company approximately $300 or $400, which according to petitioner was the "real value" *314 of the car. Aside from this self-serving testimony, petitioner offered no evidence to establish that he in fact reimbursed Lykeki for the Ford LTD or to establish that the automobile's fair market value was less than $1,100. Petitioner adduced no evidence to establish that Lykeki did not have sufficient earnings and profits available to support dividend treatment in 1973. Accordingly, we sustain respondent's determination that petitioner received a constructive diidend totaling $6,600 from Lykeki in 1973. b. 1974
Respondent determined that, during his 1974 taxable year, petitioner received $18,200 of wages from Champs, $11,797.32 of dividends from Lykeki, and $1,078.29 of interest income. Petitioner agrees that he received taxable wages of $18,200 and apparently does not dispute that he received interest income as determined by respondent. Petitioner used the bank account of Lykeki to pay for various personal expenses during 1974. Respondent determined that petitioner received constructive dividends from Lykeki in the amount of $11,797.32 in 1974. According to respondent, he arrived at his figure by adding together all monies that were taken out of Lykeki for petitioner's personal *315 benefit and subtracting therefrom all monies that petitioner put into the business of Lykeki from his personal accounts. [7]
Petitioner admitted that he used funds of Lykeki to purchase items for his personal benefit, but he has attempted to dispute respondent's determination that said use of Lykeki's funds gave rise to constructive dividends. Petitioner's attempts in this respect are wholly unpersuasive. Petitioner freely admitted that he purchased a motorcycle for his son, using a check in the amount of $740.40 drawn on the account of Lykeki. At trial petitioner claimed that, a few days after the motorcycle was purchased, he took out a bank loan in the amount of the purchase price and redeposited the proceeds of that loan into the account of Lykeki. However, Hull testified that he examined the records of Lykeki and was unable to discover any such deposit into the account of Lykeki. In the interest *316 of giving petitioner every opportunity of presenting his case, this Court held the record open for a 2-week period following trial to allow petitioner to introduce documentary evidence of the alleged bank loan and redeposit into Lykeki's account. Petitioner thereafter introduced into evidence a document purporting to evidence the loan. Having examined the document introduced by petitioner, we fail to see how it can be of any assistance to him. The document submitted by petitioner does not so much as identify petitioner as having any connection with it. It in no way shows that a loan was taken out by petitioner and certainly does not serve as evidence of any deposit being made into Lykeki's account. In his letter transmitting the document, petitioner stated that he made monthly payments of $62.19 on the alleged loan for a period of 12 months, for a total payment of $746.28. As respondent points out, if such were the case, the bank loan bore interest at the very attractive and unbelievable rate of less than 1 percent. In short, petitioner has offered no credible evidence to establish that he repaid Lykeki the amount of the funds used to purchase the motorcycle. Petitioner's attempts, *317 in general, to dispute receipt of constructive dividends from Lykeki in 1974 raise a considerable question with respect to his credibility. In explaining why the amounts withdrawn from Lykeki should not be treated as constructive dividends to him, petitioner has offered at least three contradictory theories. In one of his interviews with Hull and Temple, petitioner stated that he was entitled to use funds of Lykeki to purchase the Hatteras Yacht in 1974 because he had never drawn a salary from Lykeki. At trial petitioner changed his story and maintained that he was entitled to use Lykeki's funds because the corporation owed him a great deal of money for travel expenses for which he had not received reimbursement or, alternatively, that the monies withdrawn from Lykeki in 1974 represented monies that petitioner had loaned or otherwise contributed to the corporation to get it started. While perhaps any one of petitioner's explanations for the 1974 withdrawals from Lykeki may have been logical standing on its own, the fact that he has managed to formulate three inconsistent explanations casts doubt on the truthfulness of any of them. Petitioner offered no evidence with respect to *318 the earnings and profits of Lykeki. Under the circumstances, we conclude that petitioner received a constructive dividend of $11,797.32 from Lykeki in 1974. c. 1975
Respondent determined that, during his 1975 taxable year, petitioner received $7,000 of wages from Champs, $1,417.99 of dividends from Lykeki, $19,055 of dividends from Champs, and $850 of interest income. Petitioner agrees that he received wages of at least $7,000 and evidently does not dispute that he received interest income as determined by respondent. During 1975 petitioner again used the bank account of Lykeki to pay for various personal expenses. For example, Lykeki paid $565 to Engines Unlimited for work done on petitioner's Hatteras yacht and $437 to Edgewater Yacht Club for docking the yacht. Respondent determined that petitioner received constructive dividends from Lykeki in the amount of $1,417.99 in 1975 by adding together all monies taken out of the corporation for petitioner's personal benefit and subtracting therefrom all monies that petitioner put into the business of the corporation from his personal accounts. Petitioner apparently does not dispute respondent's determination that $1,417.99 was withdrawn *319 from Lykeki in 1975 for petitioner's personal benefit, but merely disputes that he is taxable on the withdrawals. Although it is unclear from the record, petitioner presumably takes the position that he is not taxable on such withdrawals under one of the various theories discussed above in connection with the 1974 constructive dividend from Lykeki.For the reasons set forth above, we reject petitioner's attempt to dispute taxability of the withdrawals. Again, petitioner offered no evidence with respect to Lykeki's earnings and profits. Accordingly, we sustain respondent's determination that petitioner received constructive dividends from Lykeki in the amount of $1,417.77 in 1975. With respect to the determined $19,055 of dividends from Champs, petitioner admits that he withdrew approximately that amount from Champs by selling various assets of the corporation and converting the proceeds to his own personal use. Petitioner argues, however, that the diverted sums did not constitute dividends because he simply was divesting himself of his stock in the corporation. Apparently petitioner is contending that the sums withdrawn from Lykeki represented a return of capital. Petitioner's *320 return of capital argument will not withstand scrutiny. In the first place, when pressed by respondent, petitioner admitted that he had never discussed his alleged plan of divestiture with Gladys Cockey, the other 50-percent owner of Champs. More importantly, it is clear under the facts, that petitioner did not divest himself of his stock ownership in Champs during 1975 but rather assigned all of his interest in the corporation to Gladys Cockey during the following year. After petitioner left the country in May 1975, Gladys Cockey was appointed the receiver for Champs. In early 1976 the assets of Champs were sold, and the net proceeds realized therefrom totaled $38,205.01. By order of the state court before which her divorce action was pending, Gladys Cockey was permitted to withdraw $19,102.51, which represented her one-half interest in the net sales proceeds. In October 1976 petitioner and Gladys Cockey entered into a property settlement agreement pursuant to the divorce action. The agreement acknowledged that petitioner had failed to pay child support and had reduced corporate assets to his possession and control without the permission of Gladys Cockey. Accordingly, in satisfaction *321 of these and other obligations, petitioner agreed to assign the remaining proceeds from the sale of Champs' assets to Gladys Cockey. In contending that the money diverted from Champs in 1975 was actually a payment for his stock interest in the corporation, petitioner is asking us to ignore the terms of the subsequently executed property settlement agreement, whereby petitioner purported to assign his interest in the proceeds derived from the sale of the corporation's assets. This we decline to do. Petitioner presented no evidence whatsoever that would justify a holding that the sums diverted from Champs in 1975 merely represented a return of capital. Likewise, he presented no evidence to establish that Champs did not have earnings and profits sufficient to support a dividend. Under the circumstances, we hold that petitioner has failed to carry his burden of proving erroneous respondent's determination that he received constructive dividends of $19,055 from Champs in 1975. Addition to tax for fraud
Respondent determined that all or a part of the underpayments of tax by petitioner for 1973, 1974, and 1975 was due to fraud, and hence seeks to impose an addition to tax for fraud under *322 section 6653(b) for each of those years. Fraud, for purposes of the section 6653(b) addition to tax, has been defined as an intentional wrongdoing with the specific intent to evade a tax believed to be due and owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958). The addition to tax for fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Respondent has the burden of proving, by clear and convincing evidence, that some part of an underpayment for each year was due to fraud. Section 7454(a); Rule 142(b). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed; rather, it must be established *323 by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Having considered all of the evidence before us, we conclude that respondent has established, by clear and convincing evidence, that there was an underpayment in each of the years in issue and that at least some part of the underpayment for each of those years was due to fraud. The evidence reveals that petitioner was aware of the responsibility of filing proper income tax returns and in fact filed returns for a number of years immediately preceding the years in issue. However, although petitioner knew that he had sufficient income to require the filing of a return for his 1973 taxable year and was contacted on numerous occasions by his accountant with respect to the preparation of such a return, petitioner nevertheless failed to file for that year. Likewise, petitioner failed to file returns for the succeeding 2 years. *324 A pattern of nonfiling, when coupled with affirmative evidence of intent to defraud, warrants imposition of the addition to tax for fraud. Stoltzfus v. United States,supra at 1004-1005; Grosshandler v. Commissioner,75 T.C. 1, 19 (1980). Petitioner offered no tenable explanation for his failure to file individual income tax returns for the years in issue. At one point in the trial, petitioner indicated that he could not file accurate returns because he was unable to obtain financial information such as bills from his ex-wife. Petitioner's explanation in this respect is patently weak. Petitioner and his wife did not separate until September 1974, several months after the due date for the 1973 return. With respect to 1975, petitioner and his wife lived apart for the entire year, and petitioner offered no reason why he would not have had access to all information regarding his income for that year and the expenses that he himself incurred during that year. With respect to 1974, petitioner knew that he had income and certainly could have filed a return reporting his income, even assuming he was in doubt with respect to his expenses for the year. At another point in the trial petitioner *325 claimed that he did not file personal income tax returns because he was afraid of filing incorrect returns and afraid of being found guilty of fraud. Petitioner stated, "I have been unable to file because if I can be sent to jail for 30 days for being late then I'm sure not going to file a fraudulent return." Petitioner's statement was evidently made in reference to his conviction in June 1980 of willful failure to file an income tax return pursuant to section 7203. Thus, petitioner's testimony related to his state of mind after he had been sent to jail in 1980, several years after the due dates of the returns in issue. As such, his testimony has no relevance to the issue of petitioner's intent at the time the returns in issue were required to be filed. In short, petitioner's explanations for his failure to file personal income tax returns are so weak that they are perhaps more damaging than would have been the case had he offered no explanation at all. Petitioner also made numerous inconsistent statements both at trial and during his interviews with Special Agent Temple and Revenue Agent Hull regarding the constructive dividend issue. Such inconsistencies raise a serious question *326 with respect to his credibility and forthrightness, in general, and may be considered as evidence of continuing attempts to conceal his true tax liability for the years in issue. Petitioner testified that he, on his own initiative and prior to learning of the criminal investigation, contacted the Internal Revenue Service when he returned from the Caribbean in April 1976 to request assistance in filing his returns but that he was given no assistance. Petitioner also testified that he contacted Special Agent Temple in April 1976 about getting his "taxes straight. " Petitioner's testimony in this respect did not impress us as credible. Temple, on the other hand, credibly testified that he had no recollection of petitioner contacting him in April 1976 and that he first met with petitioner at the interview he set up in September 1976. Temple testified that he had no memorandum of any contact with petitioner in April 1976 and that in all likelihood he would not have recommended prosecution if petitioner had contacted him voluntarily prior to learning of the criminal investigation. Moreover, he testified that, had petitioner contacted him in April, he would not have delayed setting up *327 an interview until September. In addition, petitioner's actions in diverting rather substantial amounts of money from Champs and Lykeki, and his actions in having Lykeki pay various of his personal expenses, may also be considered as badges of fraudulent intent. [8]
In light of the foregoing, we conclude that respondent has carried his burden of proving that at least some part of the underpayment of tax by petitioner for each of the years in issue was due to fraud and accordingly hold that petitioner is liable for the section 6653(b) addition to tax for each of those years. Transferee Liability
Section 6902(a) provides that the burden of proof shall be on respondent to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax. In the instant case, petitioner has agreed to be bound by this Court's decision in Cockey v. Commissioner,T.C. Memo. 1983-609, holding him liable as transferee of the assets of Champs. Under section 6902(a) petitioner bears the burden *328 of proving that respondent's determination with respect to the tax liability of Champs for 1974 and 1975 is erroneous. Petitioner contends that Champs filed a corporate income tax return for 1974 showing a loss of approximately $40,000. We have rejected said contention and have found as a fact that, although petitioner had a return prepared for Champs' 1974 taxable year, such return was not filed but merely was turned over to the state court before which Gladys Cockey's divorce action was pending. Similarly, as far as we have been able to determine from the record, Champs did not file a corporate income tax return for its 1975 taxable year. Because the books and records of Champs were not adequate to determine the corporation's income for 1974 and 1975, respondent utilized a modified bank deposits method to determine Champs' income for those years. It is well established that, in the absence of adequate books and records, respondent may determine a taxpayer's income by a bank deposits analysis. Goe v. Commissioner,198 F.2d 851, 852 (3d Cir. 1952); Nicholas v. Commissioner,70 T.C. 1057, 1064 (1978); Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. by order 566 F.2d 2 (6th Cir. 1977). *329 Where a taxpayer has filed to maintain adequate records as to the amount and source of income, and respondent has determined that the deposits are income, petitioner has the burden of showing that the determination is incorrect. Rule 142(a); Estate of Mason v. Commissioner,64 T.C. at 657. Deficiencies
a. 1974
Respondent determined that deposits to Champs' bank accounts for 1974 totaled $374,256.04. He then gave the corporation credit for nontaxable deposits totaling $23,713.01. Since Champs used the accrual method of accounting in keeping its books and records, respondent found it necessary to make certain adjustments to the bank deposits method of computing Champs' income. Specifically, he subtracted from the deposits the accounts receivable balance at the end of 1973 in an attempt to prevent a double inclusion in the corporation's income. He added to the deposits the accounts receivable balance at the end of 1974 to reflect income accrued but not yet received. Respondent also determined that Champs had a cost of goods sold of $257,526.95 and other business deductions of $81,421.11 in 1974. These determinations resulted in an asserted deficiency of $2,004.79. Petitioner vigorously *330 objects to the foregoing method of reconstructing Champs' income. However, his precise contentions are unclear. At one point in the trial petitioner maintained that Champs was a cash basis taxpayer. At another point, petitioner stated that the accrual method "is the only way to bookkeep merchandise in the boat business" and that respondent's calculations placed Champs on the cash basis method of accounting, resulting in inevitable overlaps. While we recognize that reconstructions comparable to the one used by respondent herein are rarely, if ever, exact, they are not required to be. It is enough that the reconstruction be reasonable in light of all the attendant facts and circumstances. The dilemma in which petitioner finds himself, having kept inadequate records of his controlled corporation, is of his own making. Petitioner has failed to offer any credible evidence in rebuttal of the accuracy of respondent's computations. In the absence of any such evidence, and although we are troubled by respondent's failure to introduce sufficient documentary evidence to verify the accuracy of his determinations, we must conclude that petitioner has failed to carry his burden of proving *331 that respondent's determination of Champs' tax liability for 1974 is erroneous, and we accordingly, sustain that determination. b. 1975
Respondent determined that deposits to Champs' bank accounts for 1975 totaled $37,205.26. He then gave the corporation credit for nontaxable deposits totaling $13,278.85. To prevent a double inclusion in the corporation's income, respondent subtracted out the accounts receivable balance at the end of 1974, the amount of which had already been included in his 1974 calculations. Respondent also determined that various items of income that were not deposited into Champs' accounts were properly chargeable as income to the corporation. The transactions giving rise to these items of income represent essentially the same transactions, with certain modifications, by which petitioner diverted approximately $19,000 from Champs in 1975. Petitioner does not dispute that the proceeds from these sales were not deposited into Champs' bank account. Respondent determined that total gross receipts for Champs in 1975, after taking all adjustments into account, amounted to $40,062.06 and further determined that Champs had a cost of goods sold of $24,321.72 and *332 other business expenses of $24,530.78 for 1975. These determinations by respondent resulted in a loss to Champs of $8,790.44, which loss was carried back to Champs' 1972 taxable year. According to respondent, the determined $182.21 deficiency for 1975 resulted from a recomputation of a prior year's investment credit. Again, petitioner proffered no evidence whatsoever to disprove respondent's determined deficiency, which is presumptively correct. In the absence of any such evidence, we sustain respondent's determination. Addition to tax for fraud
Respondent determined that at least some part of the underpayment of tax required to be shown on Champs' 1974 return was due to fraud and, hence asserts that petitioner, as transferee of the corporation, is liable for the addition to tax for fraud under section 6653(b) with respect to Champs' 1974 taxable year. Section 7454(a) places the burden of proving fraud on respondent, and it must be proven by clear and convincing evidence. Carter v. Campbell,264 F.2d 930, 936 (5th Cir. 1959); Green v. Commissioner,66 T.C. 538, 549 (1976). Respondent must establish both (1) that there was an underpayment and (2) that at least part of the underpayment *333 was due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972); Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Without an underpayment of tax there is nothing to which the 50-percent addition to tax for fraud can attach. Thus, affirmative proof of an underpayment is a necessary part of respondent's burden. To prove an underpayment, respondent is not required to establish the precise amount of the deficiency determined by him. However, he cannot discharge his burden by simply relying on the taxpayer's failure to prove error in his determination of the deficiency. Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). Respondent attempted to establish an underpayment in Champs' 1974 tax liability through a modified bank deposits analysis. He was required to do this by clear and convincing evidence. In our opinion he failed to do so. Respondent's proof consisted of little more than having the revenue agent testify, in a more or less conclusory fashion, with respect to the analysis he performed. Respondent submitted into evidence little in the way of underlying documentary support for or verification of his determination. *334 In addition, we recognize that a reconstruction of income such as was used in the instant case is inherently fraught with inaccuracies. We conclude under the circumstances that respondent falls short of satisfying the requisite burden of proof. The conclusion that respondent has failed to establish an underpayment by clear and convincing evidence obviates the necessity of inquiring into the issue of fraudulent intent. In light of the foregoing, we hold that petitioner, as transferee, is not liable for the section 6653(b) addition to tax for 1974. Addition to tax under section 6651(a)
Respondent determined that petitioner, as transferee of Champs, was liable for the addition to tax for failure to timely file a return under section 6651(a) with respect to Champs' 1975 taxable year. Under section 6651(a), respondent may add to the tax due upon a return an amount not exceeding 25 percent if the return is filed late, unless the taxpayer shows that such failure is due to reasonable cause and not due to willful neglect. Although the record is not entirely, clear, we have found as a fact that Champs filed no corporate income tax return for its 1975 taxble year. Petitioner bears the burden *335 of proving that Champs' failure to timely file a 1975 return was "due to reasonable cause and not due to willful neglect." Rule 142(a). However, he adduced no evidence whatsoever on this point. Accordingly, we sustain respondent's determination that petitioner, as transferee, is liable for the addition to tax for delinquent filing under section 6651(a) for the taxable year 1975. Decisions will be entered under Rule 155.
Footnotes
1. Petitioner's Forms W-2 for 1973 and 1975 actually reveal that petitioner received wages of $32,212.50 and $7,350, respectively. Respondent's analysis of Champs' payroll checks led him to conclude that the figure on the 1973 Form W-2 was overstated by $2,012.50 and that the figure on the 1975 Form W-2 was overstated by $350.↩
2. The nontaxable items included Maryland sales tax collected, customer refunds, returned checks, and customer taxes collected for the DMV and CBA.
3. The nontaxable items included Maryland sales tax collected, customer refunds, returned checks, customer taxes collected for the MDV and CBA, transfers from one Champs' account to another, and a loan from Cladys Cockey. 4. Mr. Jenkins actually purchased the boat for $7,155. Respondent determined that petitioner retained $6,055 of the sales proceeds and deposited $1,100 of the proceeds into Champs' bank account. Since Hull had already taken $1,100 of the proceeds into account as deposits, he increased Champs' gross receipts by only $6,055 of the total purchase price.↩
5. The notice of deficiency actually states in one place that Champs had gross receipts of $349,056.96 in 1974, and in another place the notice of deficiency states that Champs had gross receipts of $349,256.96 in 1974. It is clear from the evidence and respondent's position on brief that the numbers in the notice of deficiency are erroneous.↩
6. All Rule references herein are to the Tax Court Rules of Practice and Procedure.↩
7. Respondent notes on brief that he has inadvertently given petitioner a benefit in computing the dividend income from Lykeki in the above-described manner, since there is no basis in the statute for reducing the amount of dividend income by a shareholder's contributions to a corporation.↩
8. Cf. Gualtieri v. Commissioner,T.C. Memo. 1981-104; Smith v. Commissioner,T.C. Memo. 1980-410; A.A. Aaron, Inc. v. Commissioner,T.C. Memo. 1978-28↩.