William S. HAGAMAN, Petitioner–Appellant,

Bonnie C. Hagaman, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 91–1458.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 7, 1991.

Decided March 6, 1992.

William E. Frantz (briefed), Donald B. DeLoach (argued and briefed), Frantz, Sanders & Grattan, Atlanta, Ga., for petitioner-appellant.

Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S., Office of Chief Counsel, Washington, D.C., Gary R. Allen, Acting Chief (briefed), Robert S. Pomerance, Kenneth W. Rosenberg (argued), U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for respondent-appellee.

Before MERRITT, Chief Judge, GUY, Circuit Judge, and WELLFORD, Senior Circuit Judge.

WELLFORD, Senior Circuit Judge.

We AFFIRM the decision of the Tax Court, cited as 56 T.C.M. (P–H) 2,948 (1987), on this appeal, but REMAND to that court to deal with the issue of the effects of IRC § 312(a).[1]

First, we set out essential stipulated facts for an understanding of the decision reached. William S. Hagaman (Hagaman) and his wife, Bonnie (Mrs. Hagaman), Tennessee residents, filed joint tax returns from 1975 through 1978 (a.k.a., "the years

---

1. We are at a loss to understand the delay between the opinion of the Tax Court filed October 27, 1987, 1987 WL 49108, and its decision entered January 4, 1991. Appeal was taken by petitioner on April 2, 1991.

in question") using a cash basis of accounting. Previous to 1975, Hagaman had been in the trucking and real estate development business and then acquired several trucking terminals. In the 1960s, he expanded into construction and sale of petroleum products at truck stops in Tennessee and in Alabama. Mrs. Hagaman, due to financial problems encountered in Hagaman's construction business, acquired the stock of several truck stop operations in Tennessee, each of which operated a restaurant as a separate corporation wholly owned by Hagaman. Effective January 1, 1975, various Hagaman corporate entities merged so that the resulting entity, Hagaman Truck Haven, Inc., owned by Hagaman and Mrs. Hagaman, owned the truck stops at Lebanon, Nashville, and Franklin, Tennessee, and the restaurant operations at these locations.

Both petitioners had been active in their businesses. In June 1977, there was a further merger of Hagaman corporate entities which then operated truck stops and/or restaurants at Lebanon, Knoxville, Nashville, Franklin, and Chattanooga, Tennessee.[2] Hagaman was president and principal shareholder of the corporations from 1975 through 1978. During this period, the businesses owned or leased cigarette vending machines and/or pinball machines at the various truck stops, revenues from which were in the form of cash.[3] Each operating corporation (or corporations) used the accrual method of accounting during the period in question.

Vernon Liston, an independent accountant, prepared tax returns for the principal operating corporation, Hagaman Truck Haven, Inc. (hereafter "Truck Haven"). The Hagamans had two children, Deborah H. Hackney and William Hagaman, Jr., both of whom had homes built during 1975 and 1976. William, Jr.[4] and Deborah's husband, George Phillip Hackney, both worked for Truck Haven. The corporation paid certain contractors directly for the construction of the children's houses. These amounts were treated as "corporate operating expenses" and claimed by Truck Haven as income tax deductions in 1975 and 1976. Neither Hackney nor William, Jr. reported these amounts as taxable income on their returns.

The Tax Court had before it Truck Haven tax returns for 1974 through 1976, and returns for Superior Trucking Service, Inc. (Superior), into which Truck Haven was merged in June of 1977, for two fiscal periods in 1977 and 1978.[5] On their personal joint return, the Hagamans reported taxable income from vending machines of $7,179 in 1975; $5,916 in 1976; $7,924 in 1977; and no vending machine income in 1978.

In June of 1982, Hagaman was charged with two counts of violating IRC § 7201 for the years 1975 and 1976. Hagaman pleaded guilty to one charge of income tax evasion for 1975. He was sentenced for this offense. His plea is conceded to be "conclusive and binding upon him, and as a result, Hagaman is estopped ... under the doctrine of collateral estoppel ... from denying that he willfully filed a false and fraudulent income tax return for ... 1975 with intent to evade and defeat a portion of income tax due." He concedes liability for a fraud penalty for 1975 under IRC § 6653(b). Deficiencies of $191,081, $199,079, $137,029, and $140,937, plus 50% fraud penalties, were sought against petitioners for 1975 through 1978. The Tax Court stated that

[a]fter concessions, the issues remaining for our decision are: (1) Whether the petitioners received dividend income from a corporation controlled by them in the amounts determined by the Commissioner; (2) whether the petitioners are entitled to losses from a small business

2. All five truck stops had been operated by the Hagamans since 1975.

3. In Chattanooga, there was rental space available and rented to various tenants. Rentals at Chattanooga were paid to "Johnson's One Stop Truck Stop" or "Motor Center."

4. William Hagaman, Jr. worked part-time according to his father.

5. Superior changed its name back to Truck Haven in 1978.

corporation claimed by them in 1975, 1976, and 1977; (3) whether the petitioners must report as interest income $9,500 which the Commissioner determined was received by them in 1975; and (4) whether petitioner William S. Hagaman is liable for the addition to tax for fraud under section 6653(b) for 1975 through 1978.

The Tax Court found that Daugherty, a certified public accountant, worked as controller in the principal corporate office at Chattanooga, the residence of the Hagamans and their children. The Hagamans and Hackney worked at this Chattanooga office as did operations manager, Thomas R. Crooks, who was the overseer of all truck stop operations and reported directly to Hagaman. The truck stops all sold gas and petroleum products, operated repair shops and gift shops, and provided allied services to consumers twenty-four hours a day. Each truck stop had cigarette, pinball, and vending machines.[6] Each truck stop had an independent manager or shift manager who compiled daily sales reports of the store's sales and cash position.[7] Hagaman himself rarely visited these locations. Daily sales reports and bank deposit receipts were sent "periodically" by each truck stop to the Chattanooga main office and there recorded in a receipts journal. Monthly totals were made and posted to the corporate general ledger.

In the early 1970s, Hagaman began diverting income from pinball and vending machines located at the truck stops. He told the manager of the Knoxville location to report only one-half of the cash income and turn over the other one-half to Crooks for Hagaman. Later, Hagaman instructed the Knoxville manager to deliver all the vending machine income to him (or his agent) and not to report these amounts ($2,000–$4,000 monthly) as corporate income. Usually Crooks picked up this cash for Hagaman. The Knoxville truck stop reported $3,457 in 1975, $753 in 1976, and

none in 1977 or 1978 from vending operations.

A similar pattern was followed, beginning in 1974, at the Lebanon truck stop. The Lebanon manager delivered from $700 to $1400 in cigarette vending machine income each month to Crooks. Only ten percent of pinball machine income was reported on the daily sales reports.[8] The Lebanon operation reported $12,698 in 1975, $14,255 in 1976, $12,451 in 1977, and $5,824 in vending income from all sources.

The manager of the Franklin truck stop also did not deposit all vending machine income received from 1969 through 1974, and he usually gave the unreported cash to Hagaman directly. Hagaman permitted the Franklin manager to keep some of this unreported cash for himself. There was no evidence about 1975–1978 procedures at the Franklin truck stop concerning vending machine operations, but it reported such vending income of $11,618 in 1975, $8,002 in 1976, $5,264 in 1977, and $2,813 in 1978. There was no explanation for this dramatic decrease in reported income.

The Nashville truck stop manager for the years at issue was the person who had served in this capacity at Franklin until 1974. He also did not report or deposit all cash receipts from vending machines; he delivered this unreported cash to Crooks regularly for Hagaman, keeping $100 per month for himself. From all vending machine sources, Nashville reported $19,043 in 1975, $19,909 in 1976, $17,702 in 1977, and only $7,095 in 1978.

The Chattanooga truck stop during the years in question followed the Knoxville–Lebanon pattern generally, delivering specific quantities of unreported cash to Crooks for Hagaman, but the manager, from 1974 to 1976, retained five percent of the unreported pinball cash receipts (after rent was paid) and $100 per month of cigarette machine revenues for himself. Crooks delivered the cash to Hagaman's

---

6. There was also a leased location at Chattanooga from which rentals were received.

7. Space was provided on the sales reports for vending machine operations.

8. All income from soft drink machines was, however, regularly reported.

office at the corporate headquarters in Chattanooga. The Chattanooga truck stop reported no vending machine revenues at all from 1975 through 1978. It received rental checks of $5,400 in 1975, $21,488 in 1976, $26,820 in 1977, and $28,224 in 1978. These checks were cashed by truck stop employees and delivered, along with vending machine receipts, to the Hagaman corporate main office. On daily sale reports, Chattanooga reflected rental income of $4,000 in 1976, $3,800 in 1977, and $5,500 in 1978 (none in 1975).

The Knoxville truck stop also rented space to truckers who paid $75 to $100 per month in checks during the applicable period. As in Chattanooga, the checks were cashed and placed with vending machine receipts and turned over periodically to Crooks. This rental income was not reported. Hagaman operated a motel and restaurant in Atlanta in 1974 and operated this separately as a small business corporation. We are not concerned with this (Edgemont) operation. In 1975 and 1976, Truck Haven paid individuals to work on a yacht, the "Bilbon," owned by Hagaman. Such wages were $3,736 in 1975 and $1,185 in 1976. The corporation also paid insurance premiums on the yacht in 1975 and certain legal and accounting expenses in 1975, the basis for which was unexplained.

Liston, Hagaman's accountant, prepared tax returns from work papers furnished by Daugherty; work papers were compiled from receipts and disbursements journals and the general ledger. The IRS' examining agent Castilla analyzed cigarette sales and purchases for 1975 and 1976, and estimated revenues which should have been received at the truck stops. Castilla determined that at each truck stop there was substantial unreported cigarette vending machine income, which he estimated in total to be $85,000 in 1975 and $100,000 in 1976. A criminal IRS investigation ensued and sworn statements were obtained from truck stop managers at Knoxville, Nash-

ville, and Chattanooga resulting in the aforementioned criminal convictions against the Hagamans for filing false and fraudulent tax returns in 1975 and 1976. A similar analysis of unreported cigarette vending machine income for 1977 and 1978 took place as well as for unreported pinball machine revenues which the IRS determined to be a total of $132,000 for 1975 through 1978.

The Commissioner determined in his notice of deficiency that diverted vending machine income constituted "dividend income under sections 301 and 306" of $120,995 in 1975, $122,705 in 1976, $125,106 in 1977 and $119,154 in 1978. In addition, the notice assessed unreported income of $60,000 per year from pinball machine operations against the Hagamans.[9]

The Commissioner also, according to the Tax Court, determined that Knoxville and Chattanooga rental payments were income to the Hagamans "and consequently constituted dividend income to them"—$5,400 in 1975, $19,488 in 1976, $22,170 in 1977, and $28,590 in 1978.[10] The Commissioner likewise treated the wages paid by Truck Haven on the homes of the Hagaman children and on the yacht and employment taxes attributable thereto to be dividend income to the Hagamans totalling $77,028 in 1975 and $91,400 in 1976. The 1975 unexplained legal expense of $4,750 paid and deducted by the corporation was also deemed to be a personal expense of Hagaman and taxable to him as dividend income. There was also an interest payment adjustment from Truck Haven to Hagaman in 1975. The Commissioner added a tax fraud penalty under IRC § 6653(b) on the assessed deficiency for each year in question, but at trial the Commissioner conceded that Mrs. Hagaman was not liable for this addition.

## I.  FACTUAL DETERMINATIONS

The Tax Court considered the "first issue" to be "whether the petitioners re-

---

**9.** The $60,000 annual amount was found by the Tax Court to be "a negotiated figure agreed to by Mr. Liston and a representative of the IRS at a conference." The Hagamans were given cred-

it for vending machine income that they did report.

**10.** The Commissioner at trial conceded that the 1978 figure was overstated by $5,600.

ceived constructive dividends from Truck Haven in the amounts determined by the Commissioner." J/A 57. Virtually all of the substantial deficiency assessed was treated on the notice of deficiency as "dividend income."[11]

The facts which we have noted were supported, in our view, by substantial evidence, and in any event, were not clearly erroneous. Petitioner has not persuaded us that any of the facts herein set out were incorrect or unfounded.

■ The Tax Court's findings as to the correctness of the Commissioner's assessment of taxable income will not be disturbed on this appeal unless they are *clearly erroneous. Traficant v. Commissioner*, 884 F.2d 258, 263 (6th Cir.1989); *see Commissioner v. Riss*, 374 F.2d 161, 166 (8th Cir.1967); 26 U.S.C. § 7482(a)(1). Also, the Tax Court's finding that the taxpayer fraudulently avoided tax will not be disturbed unless it was *clearly erroneous. Traficant*, 884 F.2d at 264. "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court ... is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 398, 68 S.Ct. 525, 543, 92 L.Ed. 746 (1948).

■ In the Tax Court, the Commissioner's determination of an income tax deficiency is presumptively correct, and the taxpayer has the burden of going forward and proving that the determination is erroneous. *Traficant*, 884 F.2d at 263 (citing *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933)); *Riss*, 374 F.2d at 166; Tax Court Rules of Practice and Procedure 142(a). We agree with the Tax Court that the Hagamans' failure to produce the corporate general ledger at trial substantially weakens their argument that the ledger included substantial amounts of income beyond that reflected on the daily sales reports from the truck stops. The Tax Court carefully considered testimony of Daugherty and two of Truck Haven's bookkeepers in this regard. We find no error in the basic conclusion that "the petitioners have failed in their burden of proving that the Commissioner's determinations ... were erroneous." J/A 60.

II. *PAYMENTS FOR HOUSE CONSTRUCTION, FOR MAINTAINING THE YACHT, AND FOR LEGAL FEES*

■ Each of these items was deemed to constitute a constructive dividend to the Hagamans because they were expended by the corporation to benefit the Hagamans rather than the corporation itself. The Tax Court cited this language from *United States v. Smith*, 418 F.2d 589, 593 (5th Cir.1969): "... the corporation conferred an economic benefit on the stockholder without expectation of repayment." *See also Ireland v. United States*, 621 F.2d 731, 735 (5th Cir.1980). It determined, purportedly as a matter of fact, that these corporate expenditures were made "primarily for the personal benefit of the Hagamans" and *not* "to benefit Truck Haven's trade or business."

When a corporation confers an economic benefit upon a shareholder, in his capacity as such, without an expectation of reimbursement, that economic benefit becomes a constructive dividend, taxable to the respective shareholder. This benefit is taxable to the shareholder whether or not the corporation intended to confer a benefit upon him.

. . . . .

The determination of a constructive dividend is a question of fact, reviewable by this court under the clear error criterion.

. . . . .

First, the trial court must determine whether a constructive dividend was conferred. Then, and only then, need the trial court focus on a computation of the amount of such a dividend. *United Aniline Company v. Commissioner of In-*

---

**11.** Exceptions were $17,365 1120–S income and interest income in 1975, and a total of $1,480 1120–S income in 1976 and 1977.

ternal Revenue, 316 F.2d 701 (1st Cir. 1963); *Challenge Manufacturing Co. v. Commissioner*, 37 T.C. 650 (1962). *Loftin and Woodard, Inc. v. United States*, 577 F.2d 1206, 1214, 1215 (5th Cir. 1978).

The construction payments made by the corporation for the homes of the two Hagaman children and their spouses, the payments on the yacht, and the legal expenditures unquestionably conferred a personal benefit on the Hagamans. Petitioners failed to make a sufficient showing of any significant benefit to the corporation. The burden was cast upon petitioners in this regard. To the extent this determination by the Tax Court was a factual finding, we find no clear error. *See Sullivan v. United States*, 363 F.2d 724, 728 (8th Cir.1966). Corporate records did not reflect the home construction payments as loans nor as salary to the Hagaman son and son-in-law who were employees. *See Epstein v. Commissioner*, 53 T.C. 459, 474–475 (1968). Hagaman virtually concedes that there was no business purpose demonstrated in these corporate expenditures. He argues, however, that these items should not be charged as being taxable to him but rather should be charged to his children who received the real benefit in the construction of their respective homes. We find no merit in this contention because through their corporate control the Hagamans directed these payments and benefits to their children. It was as if the payments came to the Hagamans themselves and then were redirected to their children. *See Epstein*, 53 T.C. at 474–475. If deemed a mixed finding of fact and of law, we AFFIRM this determination of constructive dividend as supported by the underlying facts and circumstances and by the authority cited.

### III. UNREPORTED CASH RECEIPTS AS CONSTRUCTIVE DIVIDENDS

█ The Commissioner specifically treated the unreported cash diversions from the Truck Haven stores as constructive dividends to the Hagamans. The corporation or corporations involved were wholly owned by the Hagamans. These substantial diversions of unreported amounts of cash receipts that were derived from vending machine operations and rentals were part of a fraudulent scheme to conceal income and escape income taxes thereon. It was similar to the scheme involved in *Davis v. United States*, 226 F.2d 331 (6th Cir.1955), which resulted in a criminal indictment for income tax fraud involving $729,000 in concealed and unreported income derived by the single shareholder from corporate operations.

[I]t does not make any difference whether he received it as a legal distribution of cash as the result of a dividend, or whether he took it fraudulently, using his wholly owned corporation with its false bookkeeping methods and concealment of sales and receipts to hide the fact that he was secretly acquiring from this source the cash, over which he exercised command, control, and dominion.... For "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed...." [quoting *Corliss v. Bowers*, 281 U.S. 376, 378, 50 S.Ct. 336, 336, 74 L.Ed. 916 (1930) ] ...

What appellant did was to take funds, individually, from his wholly owned corporation, which he completely dominated and controlled. In other words, he merely took the funds from himself under a different name.... [T]he money constituted gain for the reason that, as the Supreme Court has said, he had the freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it [*e.g.* the corporation's creditors]....

Appellant makes much of the fact that the government has not fixed a label of some kind on the funds that he took from his corporation. It is not necessary to describe them as additional salary, illicit bonuses, or commissions, or anything more than *wrongful diversions*, since, as above mentioned, substance controls over form, and taxation is concerned with the actual command over the property taxed.

*Davis v. United States,* 226 F.2d at 334–35 (emphasis added).

A prominent tax authority cited *Davis,* but at the same time it noted a conflict among the circuits as to whether such "wrongful diversions" must be treated as constructive dividends in order to be included as taxable income to the recipient shareholder in civil cases such as the present controversy.

> Thus, the Tax Court has held that amounts of corporate funds diverted by the dominant shareholder constitute income to him *regardless of their treatment as a constructive dividend, such that taxability of diversions to the dominant shareholder remains independent of the existence of corporate earnings and profits.* [Citing *Leaf v. Commissioner,* 295 F.2d 503 (6th Cir.1961)]. The Second Circuit, however, following the lead of the Eighth Circuit, has ruled for *civil* tax cases that shareholders' diversions must be treated as constructive dividends.... For *criminal* cases, the courts have held alternately that diversions are includable to the shareholder regardless of corporate earnings and profits. [Citing *Davis,* 226 F.2d 331 (6th Cir.1955)].

*Merten's Law of Federal Income Taxation,* § 38B.11, at 45–46 (1985) (emphasis added). *Compare Drybrough v. Commissioner,* 238 F.2d 735 (6th Cir.1956); *Weir v. Commissioner,* 283 F.2d 675 (6th Cir.1960); and *Benes v. Commissioner,* 42 T.C. 358, 378 (1964), *aff'd,* 355 F.2d 929 (6th Cir.), *cert. denied,* 384 U.S. 961, 86 S.Ct. 1587, 16 L.Ed.2d 673 (1966).

It is unclear from the above authorities whether in this circuit such wrongful or fraudulent diversions of cash from vending machines by a principal and dominant shareholder need be considered constructive dividends or whether as simply "wrongful diversions" they may be taxed as ordinary income to the recipient regardless of the amount of earned and accumulated surplus in the corporation under IRC

§ 61. *See Estate of DeNiro,* 746 F.2d 327 (6th Cir.1984); *see also* S.D. Gardner, *The Tax Consequences of Shareholder Diversions in Close Corporations,* 21 Tax L.Rev. 223 (1966).

The Tax Court, in a recent decision, *Truesdell v. Commissioner,* 89 T.C. 1280, 1298 (1987), disagreed with *Davis* and *Weir,* and distinguished *Leaf.*[12] It also directed that *Benes* would no longer be followed. *Id.* at 1299. The Commissioner has clearly taken the position that the diversions in this case are to be treated as constructive dividends. We, therefore, proceed to the second step described in *Loftin and Woodard, Inc.* to reflect upon the *amount* of the constructive dividends, taking into account the available accumulated earnings and profits of the corporation. The Commissioner did not contend that the Hagamans' diversions from the controlled corporation or corporations were anything other than constructive dividends.

Clearly in this case from the outset when the deficiency notice was issued to the Hagamans, the Commissioner expressly relied upon the constructive dividend theory, although he probably was not limited to this approach, at least in this circuit. Under this theory, the Commissioner may have taxed the corporation, as well as the Hagamans personally, for the diversions of cash. *See Truesdell* at 1300, and *Drybrough.* The Commissioner concedes in his brief that "the Tax Court concluded that the taxpayer was properly taxable on all of the *constructive dividends* attributed to him." Brief at 24 (emphasis added). The Commissioner made no contention administratively, before the Tax Court, or in his brief filed with this court, that the skimmed money should be treated otherwise than a constructive dividend. It follows, then, that the diversions, treated as constructive dividends, must be reviewed in light of the corporation's accumulated earnings and profits in the years involved.

The Tax Court stated that "[t]he parties agree that Truck Haven had current earn-

---

**12.** In *Truesdell,* the Tax Court emphasized also that "in a case such as this, diverted amounts taxed to a shareholder as constructive dividends

also remain fully taxable to the corporation to which attributable." *Id.* at 1300.

ings and profits of $198,635 in 1975, $1,035,471 in the short year from July 1 to December 31, 1977, and $138,671 in 1978 ... [and] a deficit in current earnings and profits in 1976 and in the short year ended June 30, 1977." J/A 66. At least, then, to the extent of the agreed upon corporate earnings in 1975, 1977 (part of the year) and 1978, there were constructive dividends to the Hagamans for which they were properly assessed an income tax deficiency. We find no error in the assessments against the Hagamans as taxable constructive dividend income for the cash siphoned off to Hagaman from rentals and vending machine operations. Hagaman's guilty plea on the tax concealment activity in 1975 constitutes an admission as to fraudulent diversions in that year. To the extent similar such cash diversions occurred in 1976, 1977, and 1978, the Commissioner might properly infer continued fraudulent siphoning of constructive dividend income to Hagaman in those years.

Since the notice of deficiency, and the Commissioner's position throughout, as noted, has been based on the constructive dividends theory, we find it necessary to examine whether there were accumulated corporate earnings and profits from which the Hagamans took constructive dividends. The Tax Court based its decision entirely on the Commissioner's theory of constructive dividends.[13] The Commissioner might have proceeded on an alternative theory of fraudulent or wrongful diversion in addition to or instead of a constructive dividend theory, as in *Davis, Weir* and *Estate of DeNiro,* but chose not to do so. *See* 746 F.2d at 333. We feel that the Commissioner is bound by this decision and proposed treatment of corporate diversions in this case.[14]

## IV. ADJUSTMENT AND INCREASE IN CORPORATE ACCUMULATED EARNINGS AND PROFITS

We now consider the $550,000 addition to accumulated earnings and profits of Truck Haven made by the Commissioner pre–1975, the effect of which, absent other adjustments, made all the skimmed vending machine income constructive dividend taxable to the Hagamans from 1975 through 1978 according to the Commissioner. The Hagamans argue on appeal:

The court below also erred in holding that Truck Haven had sufficient earnings and profits to support the constructive dividends determined by the court. The Tax Court clearly erred in allowing the Commissioner's agent to make a last minute adjustment to the earnings and profits of Truck Haven not before the court in order to increase the earnings and profits of Truck Haven for the years before the court. If allowing such an adjustment was not clear error, then the Tax Court's failure to decrease the earnings and profits of the corporation by the amount of the alleged distributions to Mr. Hagaman was error as a matter of law under the operative statute.

Appellant's Brief at 21.

The adjustment of $550,000 to Truck Haven's accumulated earnings was not a part of the notice of deficiency issued to the Hagamans. It was based upon trial testimony of IRS agent Lowery Underwood, who succeeded agent Castilla on the case. The Commissioner made the contested adjustment by adding $550,000 to the figure reflected on the corporate records as accumulated earnings and profits of Truck Haven as of December 31, 1974.[15] The $550,-

---

**13.** "We conclude that the petitioners have failed to prove that the *Commissioner's determination that such payments were constructive dividends* to them was erroneous." 56 T.C.M. (P–H) 2948, 2956 (1987) (emphasis added). The issue stated at the outset was whether the petitioners received dividend income from a corporation controlled by them.

**14.** The notice of deficiency specifically asserted the vast bulk of the assessments in question as

"dividend income." The notice treated such income under IRC §§ 301 and 316.

**15.** Underwood testified that the corporation's figure was $346,335 as of December 31, 1974. *See* J/A at 481. His "Earnings and Profits Schedule" (Ex. EN), however, reflected a "balance as of 12–31–74 of $188,870 plus Sec. 368(a) merger figures for Truck Huddle and Truck Harbor of $47,762 and $97,477, respectively, a total of $334,109." We shall accept the figure adopted by the Tax Court as the correct amount.

000 amount reflected estimates of unreported and diverted income of Truck Haven during the tax years 1971 through 1974 of $125,000, $135,000, $135,000 and $155,000, respectively.

The Hagamans had ample opportunity at trial to cross-examine the IRS agent concerning the basis for this adjustment. They also had an opportunity to present evidence to rebut the accuracy of these adjustments. The burden, once again, was upon the Hagamans to refute the Commissioner's contentions as to the amount of accumulated earnings and profits. *See infra* note 16; *see also Alterman Foods v. United States*, 611 F.2d 866, 222 Ct.Cl. 218 (1979). Based upon the pattern evidence during the tax years involved about diversion of vending machine receipts and rental payments, we find no clear error in the Commissioner's determination, nor in the Tax Court's finding, that a total of $550,000 should be added to corporate earnings and profits for the years 1971 through 1974, representing cash receipts from truck stop vending machine operations diverted by Hagaman to his own use. *See Truesdell*, 89 T.C. at 1300.

## V. *SECTIONS 316 AND 312 CONSIDERATIONS*

■ Title 26 U.S.C. (IRC) § 316(a) (1978) provides that "the term, 'dividend' means any distribution of property made by a corporation to its shareholders—(1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year...." To be taxable to the Hagamans, then, the "constructive dividends" from Truck Haven must have been from accumulated earnings and profits available to the corporation. *See Loftin and Woodard, Inc., supra.* We have determined that the Tax Court was not in error in making an upward adjustment to the amount of accumulated earnings and profits of Truck Haven as of year-end 1974, and that neither was the Tax Court in error in treating diverted cash amounts received by Hagaman as constructive dividends. We next turn to the *taxable amount* of such con-

structive dividends. *Loftin and Woodard, Inc.*, 577 F.2d at 1215; *Estate of DeNiro*, 746 F.2d at 331. In making such determination, we must review IRC § 312 together with § 316 to arrive at a proper figure of Truck Haven's accumulated earnings and profits as of each of the tax years involved beginning year-end 1974 through 1978.

■ Because dividends can only be distributed to the extent of a corporation's earnings and profits under IRC § 316, a court can only find a constructive dividend to be taxable as ordinary income to the extent of the corporation's earnings and profits.

> Otherwise, a distribution to a stockholder is merely a recovery from his basis in his shares to the extent that he has such a basis; to the extent that the payments exceed the basis, the payments amount to a gain. *See id.* §§ 316(a), 301(c).

*Estate of DeNiro*, 746 F.2d at 332.

The Hagamans made no assertion in their petition filed in the Tax Court with respect to whether or not there were insufficient accumulated earnings and profits in Truck Haven to render the alleged constructive dividends to Hagaman non-taxable in part as a return of capital. Neither did petitioners make mention of IRC § 312 in that additions to earnings and profits of the corporation by reason of Hagaman's diversions of unreported cash receipts from vending machines prior to 1975 should be reduced to the extent of constructive dividends "paid" to the Hagamans prior to 1975, or for any other reason. In this court, the Hagamans point to the fact that the Commissioner, in the deficiency notice, did not assert that there were sufficient accumulated earnings and profits in Truck Haven to make the constructive dividends to the Hagamans fully taxable. The notice did, however, assert that the alleged constructive dividends were fully taxable from 1975 through 1978. The Hagamans also claim that it was not until the trial that they learned about the pre–1975 $550,000 adjustment to accumulated earnings and profits of Truck Haven. We believe that petitioners did timely raise the § 312 issue,

and that it should be considered on this appeal.

The Tax Court made no reference to IRC § 312, which provides, in pertinent part:

**Section 312. Effect on earnings and profits**

(a) **General rule.**—Except as otherwise provided in this section, on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of—

(1) the amount of money [so distributed].

The Tax Court did find the Commissioner's estimation of unreported and diverted vending machine income to be reasonably accurate and that the Commissioner's $550,000 adjustment to the December 31, 1974, accumulated earnings and profits of Truck Haven was not erroneous, noting that "the petitioners presented no evidence to refute the amounts determined by the Commissioner." We have determined that the Tax Court was not in error in reaching this conclusion, especially since the burden was upon the taxpayer to demonstrate that the Commissioner was wrong, inaccurate, or unreasonable in respect to this adjustment to the year-end 1974 accumulated earnings and profits figure.[16]

The question under § 312 is whether the adjusted accumulated earnings and profits figure of Truck Haven is to be reduced as "a distribution of property" by the amount of constructive dividends to Hagaman, representing diversions of vending machine receipts and rental payments at Chattanooga. No authority is submitted by either party except that the Hagamans rely upon the express language of § 312(a).

In *Drybrough v. Commissioner*, 238 F.2d 735 (6th Cir.1956), this court concluded that funds diverted by a shareholder of a closely held corporation were construc-tive dividends. Without specifically stating statutory authority, we stated that "the earnings and profits available for dividends in each taxable year in issue should be reduced by the deficiencies determined against the corporation for that year." *Id.* at 740. We also held that the amount of the fraud penalties and taxes should be deducted from earnings and profits as well.

Two Tax Court cases analyze § 312(a). In *Anderson v. Commissioner*, 67 T.C. 522, 557 (1976), the court discussed the interpretations and interrelation of §§ 312(a) and 316(a)(2). The issue in that case was whether earnings and profits should first be reduced by the amount of the cash distributions or by the amount of § 302(a) redemption distributions. In reaching its conclusion, the court stated the general rule that "[s]ection 312(a) provides a rule of general application to determine the effect of corporate distributions, ... upon the earnings and profits of the distributing corporation." Holding that the specific "timing" factor in § 316(a) governed over the general "timing" language in § 312(a) ("*on the distribution* of property ... the earnings and profits will be reduced ...*"), the court explained that if the corporation has insufficient earnings and profits for both the dividend and the stock redemption, the year's *current* earnings and profits will first be reduced by the cash dividend amount, and the surplus earnings and profits, if any, will be added to the *accumulated* earnings and profits "for purposes of applying 316(a)(1) and 312(a)." *Id.* at 569. For our purposes, therefore, *Anderson* explains that, in general application, earnings and profits are reduced by the amount of dividends distributed. See also *Enoch v. Commissioner*, 57 T.C. 781, 800 (1972), which states that if distributed funds constitute a constructive dividend, earnings and profits will be reduced by such amount under § 312(a).

*Fong v. Commissioner*, 61 T.C.M. (CCH) 2450 (1991); *Zalewski v. Commissioner*, 55 T.C.M. (CCH) 1430 (1988); *Delgado v. Commissioner*, 55 T.C.M. (CCH) 155 (1988); *Cockey v. Commissioner*, 50 T.C.M. (CCH) 372 (1985); *Fein–Marquart Assocs. v. Commissioner*, 50 T.C.M. (CCH) 152 (1985).

---

**16.** Courts have repeatedly held that the individual taxpayer has the burden to establish that the corporation had insufficient earnings and profits to support the constructive dividend determined by the IRS. *United States v. Leonard*, 524 F.2d 1076 (2d Cir.1975); *DiZenzo v. Commissioner*, 348 F.2d 122, 126–278 (2d Cir.1965);

■ We believe it appropriate to RE-MAND this case to the Tax Court to determine the effect of IRC § 312(a) on the accumulated earnings and profits of Truck Haven during all the years in question (including 1971 through 1974). We are uncertain about the "Analysis of Earnings and Profits" of Truck Haven for the tax years 1975, 1976, and 1977 reflected in the joint appendix at 480, but it appears in that exhibit that "deemed distributions" for those years were, in fact, deducted from accumulated earnings and profits amounts. We question particularly whether there were also similar "deemed distributions" in the form of constructive dividends to Hagaman which should have been deducted from 1971 through 1974 arising from the $550,-000 adjustment to earnings and profits. We, therefore, REMAND for the Tax Court to consider those issues under § 312.

## VI. *FRAUD PENALTIES UNDER SECTION 6653(b)*

■ The Commissioner's determination of a tax deficiency is presumptively correct, even where the case involves fraud. *Traficant,* 884 F.2d at 263; *Zack v. Commissioner,* 692 F.2d 28, 29 (6th Cir. 1982), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983). The Commissioner, however, has the burden of proving § 6653(b) fraud by "clear and convincing" evidence. *Smith v. Commissioner,* 926 F.2d 1470, 1475 (6th Cir.1991); *Traficant,* 884 F.2d at 264; *Zack,* 692 F.2d at 29. The Tax Court's ultimate determination on the issue of fraud is a question of fact subject to a *clearly erroneous* standard of review. *United States v. Walton,* 909 F.2d 915, 926 (6th Cir.1990).

■ The applicable Tax Code provision imposes an addition to tax "equal to 50 percent of the underpayment" if any portion of such underpayment of tax is due to fraud. IRC § 6653(b) (1976).[17] The Commissioner need not prove the precise amount of the underpayment that resulted from fraud, however, but only that some part of it is attributable to fraud. *Zack,*

692 F.2d at 29. In order for a court to find a taxpayer guilty of fraud under § 6653(b), the Commissioner must show that the taxpayer "intended to evade taxes which he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes." *Walton,* 909 F.2d at 926. Such intent can be inferred from strong circumstantial evidence. *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943).

■ We stated earlier in this opinion that Hagaman's guilty plea as to his tax activity in 1975 constitutes an admission as to fraudulent diversions in that year. In regard to the issue of whether Hagaman had received constructive dividends in the years 1976–1978, we have concluded that the Commissioner might properly infer that Hagaman engaged in similar activities in the following three years. Similarly, this admission will also work in the Commissioner's favor on the issue of fraud under § 6653(b). Such admission, along with vast amounts of other evidence of Hagaman's evasive scheme which have already been mentioned in this opinion, is more than sufficient for this court to find that the Tax Court was not clearly erroneous in assessing a 50% addition to tax under § 6653(b).

■ The propriety of the *amounts* of such penalties assessed by the Tax Court require further analysis. As stated above, the fraud penalties under § 6653(b) equal 50% of the "underpayment." Under that statute, the "underpayment" is the same as the "deficiency" as defined in IRC § 6211 (1976). Basically, a § 6211 "deficiency" is the difference between the amount of tax imposed by the Commissioner and the amount reported on the taxpayer's tax return. *See* IRC § 6211. Consequently, in order to determine the amount of penalties to assess in this case, the Tax Court must first determine the amount of constructive dividends properly imposed by the Commissioner to arrive at an accurate amount of "deficiency." *See* IRC § 6653(c)(1) (1976).

---

**17.** This statute was amended in 1986 to change, *inter alia,* the amount of such penalty to 75% of the underpayment. *See* 26 U.S.C. § 6653(b) (1982 Ed.Supp. IV 1986).

*See Akland v. Commissioner,* 767 F.2d 618, 621 (9th Cir.1985) (applying 6653(b) fraud penalty after the amount of constructive dividends was determined); *see also Loftin and Woodard, Inc.,* 577 F.2d at 1236 (same, but fraud assessment was reversed).

On remand, therefore, after the Tax Court has applied §§ 316 and 312(a) in the appropriate manner and has thereby considered the amount of Hagaman's deficiency, it must then add to the assessed deficiency "an amount equal to 50 percent of the underpayment" according to § 6653(b).

RALPH B. GUY, JR., Circuit Judge, concurring in part and dissenting in part.

I concur with the court except for the discussion of the constructive dividend issue in Part V. Since I believe that the Tax Court correctly resolved that issue, I dissent from a remand for further consideration.

I agree that the Tax Court properly added $550,000 in pre–1975 unreported vending income to Truck Haven's earnings and profits. There is no dispute that this sum is sufficient to cover Hagaman's post–1974 diversions. I disagree, however, with the proposal to remand so that the Tax Court may consider whether some or all of the $550,000 had been distributed to Hagaman before 1975.

At trial, Hagaman had the burden to establish that Truck Haven lacked sufficient earnings and profits to cover his post–1974 diversions. *DiZenzo v. Commissioner,* 348 F.2d 122, 126–27 (2nd Cir.1965). Hagaman could have met that burden by showing that Truck Haven's earnings were insufficient because he had diverted some or all of the $550,000 before 1975.

Instead, Hagaman's position before the Tax Court was that there had been no diversion, either before or after 1975. Hagaman therefore produced no evidence that any portion of the $550,000 had been dis-

tributed before 1975.[1] Since Hagaman completely failed to meet his burden of establishing that Truck Haven lacked sufficient earnings and profits to cover the diversion, I would affirm the Tax Court's decision in its entirety.

---

1. Of course, Hagaman did not want to prove that he had diverted corporate income from 1971 to 1974 because such proof would tend to undercut his claim that he had not diverted income after 1974. However, the fact that he was in a strategic bind did not relieve Hagaman of his burden to prove that there were insufficient corporate earnings and profits to support a dividend.