118 T.C. No. 4

UNITED STATES TAX COURT

LARRY D. JOHNSON, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14096-99.                    Filed January 24, 2002.

        R determined that P was liable as a transferee of
assets from C and, therefore, was liable for C's tax
liabilities.  P was the 100-percent owner and president
of C.  The transfer to P was from a settlement that P,
C, and C's subsidiaries had reached with a creditor.  P
contends that the portion he received was in
consideration of his releasing a claim of his own
against the creditor for damages to business
reputation, so that, in effect, there was no transfer
from C.  R contends that the settlement belonged to the
corporate entities and that P was a transferee.

        If it is decided that the transfer was of C's
asset to P, then P contends in the alternative that the
transfer was made for adequate consideration so that
sec. 6901, I.R.C. would be inapplicable.  R contends
that under Texas law, because P was considered an
"insider", the transfer to him was in avoidance of
creditors.  P contends that he comes within an
exception to the rule relating to "insiders".  The
exception involves circumstances where the transfer to

the "insider" was made as part of the usual business practices of the "insider" and the transferor.

Held: The transfer to P was from C. Held, further, even though P was an "insider" under Texas law, the transfer was not in avoidance of creditors because it was made in good faith and as part of the usual business practices of P and C. Held, further, P is not liable as a transferee.

Gerald R. Mace and Ben D. Stevens, for petitioner.

Nancy Graml, for respondent.

GERBER, Judge: In a notice of liability, respondent determined that petitioner is liable as a transferee at law and in equity for the assessed Federal income tax liability and additions to tax of Johnson Consolidated Cos., Inc., and Subsidiaries (JCC), for its taxable year ending June 30, 1989. Respondent determined that petitioner is liable for JCC's income tax liability of $57,004.00 and additions to the tax in the amounts of $12,825.90 and $14,251.00 under section 6651(a)(1)[1] and (2), respectively.

There is no dispute concerning JCC's liability for the deficiency. The issue for our consideration is whether petitioner is liable as a transferee for JCC's unpaid Federal income tax, additions to tax, and accrued interest. If

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

petitioner is liable as a transferee, then we must decide the applicable date on which interest began to accrue.

FINDINGS OF FACT[2]

JCC was incorporated in 1985 under the laws of the State of Texas and was in the business of developing real estate. Larry D. Johnson (petitioner) was the president, registered agent, sole director, and sole shareholder of JCC and is statutorily deemed to be an "insider" under Texas law. At the time the petition herein was filed, petitioner resided in Houston, Texas.

From 1985 to 1992, JCC was involved in more than 20 real estate projects. The following companies were wholly owned subsidiaries of JCC: LDJ Construction Co.; LDJ Development Co.; Parklane Development Corp.; Rialto Development Corp.; The Johnson Corp.; Forest Homes, Inc.; Hearthstone Development Corp.; The Johnson Development Corp.; and Larry D. Johnson Interests, Inc.

In 1985, LDJ Development Co. entered into a joint venture with the Brentwood Co. called the West Mill Joint Venture (West Mill). West Mill was formed in order to purchase and develop Towne Lake, a 3,300-acre real estate project in Cherokee County. In 1986, LDJ Construction Co. purchased Brentwood's 50-percent interest in West Mill by means of a note payable to Brentwood in the amount of $709,560.

---

[2]The stipulation of facts, supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference.

In 1987, West Mill entered into a $52,500,000 construction loan agreement with Westinghouse Credit Corp. (Westinghouse). Under the agreement, petitioner and JCC each guaranteed 50 percent of the Westinghouse loan, and petitioner was required to execute all documents individually and in his capacity as a corporate representative of JCC (shareholder/president). During 1991, West Mill defaulted on the loan, and the payment obligations of West Mill were accelerated. On October 4, 1991, petitioner spoke with a representative of Westinghouse regarding a proposed settlement to resolve the default situation. A letter confirming petitioner's conversation contained the following proposals:

(i) West Mill will provide [Westinghouse] with a deed to Towne Lake in lieu of foreclosure;

(ii) Johnson Consolidated Companies (guarantor of the Towne Lake loan and controlling stockholder of both West Mill venturers) will enter into a consulting agreement with [Westinghouse] and provide consulting services related to the operation and development of Towne Lake in exchange for consulting fees approximating One Million Fifty Thousand Dollars ($1,050,000) on terms to be mutually agreed upon.

On December 5, 1991, a settlement agreement regarding the Westinghouse loan was entered into between Westinghouse, West Mill, petitioner, JCC, LDJ Development Co., and LDJ Construction Co. Throughout the settlement negotiations petitioner acted in a dual capacity on his own behalf as a guarantor of the Westinghouse loan and as a representative of the West Mill

venturers and their parent JCC.

Pursuant to the settlement agreement, West Mill conveyed all of its rights in the Towne Lake project to First Hotel Investment Corp., an affiliate of Westinghouse. Additionally, West Mill, petitioner, JCC, LDJ Construction Co., and LDJ Development Co. released any and all claims against Westinghouse. In return, Westinghouse released any and all claims, agreed not to foreclose on the Towne Lake property, and paid $1,050,000 jointly to West Mill, petitioner, JCC, LDJ Construction Co., and LDJ Development Co. The agreement did not specify to whom the $1,050,000 would be distributed.

On December 5, 1991, the $1,050,000 payment was received by JCC and on December 6, 1991, was deposited into a bank account opened by JCC to receive the $1,050,000 payment. Petitioner directed JCC to pay certain creditors of West Mill from the bank account. Of the $1,050,000 received from Westinghouse, JCC paid $269,000 to the Johnson Corp. for management fees it earned in conjunction with West Mill, and $492,442 to F. Gardner Parker, Trustee.

On January 9, 1992, petitioner submitted a request to JCC for payment to him of the remainder of the settlement fund ($286,737.27). Petitioner's payment request contained no explanation or reason for the requested transfer. On or about January 10, 1992, petitioner deposited the $286,737.27 payment

received from JCC into his personal bank account. JCC booked the transferred amount as an amount payable from petitioner. At the time petitioner received the transferred amount JCC was insolvent and had not filed its U.S. Corporation Income Tax Returns for its fiscal tax years ended June 30, 1986, 1987, and 1989, respectively.

Although petitioner was aware that JCC was insolvent, he believed that JCC's net operating losses would result in no Federal tax liability for JCC. It was usual for petitioner to advance or loan funds to JCC and/or its subsidiaries. Prior to receiving the $286,737.27 from JCC, there had been regular advances and repayments of funds between JCC and petitioner.

Petitioner's Income Tax Returns

On his 1991 Form 1040, U.S. Individual Income Tax Return, petitioner reported interest income from the Johnson Corp., in the amount of $25,924. That amount represented interest on obligations owed to him by the Johnson Corp. On his 1992 individual Federal income tax return, petitioner also reported wages from JCC's subsidiaries (the Johnson Corp. and Heritage Development Co.) in the amounts of $50,000 and $56,250, respectively. Petitioner's reported income of $304,637 did not include the $286,737.27 received from JCC.

Tax Liability of JCC

JCC's corporate income tax return, for its fiscal tax year

ended June 30, 1989, was filed on October 3, 1994. JCC reported taxable income, before net operating losses (NOLs), in the amount of $2,858,914. After applying carryover NOLs from prior tax years, JCC had no regular corporate income tax liability. JCC, however, remained liable for the alternative minimum tax of $57,004, which is in controversy in this case. The unpaid tax liability reported on JCC's return was assessed by the Commissioner on November 14, 1994. In addition, the Commissioner assessed a $12,825 late filing penalty and a $14,251 penalty for late payment of tax, plus interest as provided by law. During February 1995, the Commissioner filed a notice of Federal tax lien against JCC for its 1986 tax liabilities.

## OPINION

We consider, under section 6901, whether respondent has shown that petitioner is a transferee of JCC's assets and, hence, liable for JCC's unpaid Federal tax liability. Section 6901(a) is a procedural statute enabling respondent to collect a transferor's unpaid tax liability from a transferee of the transferor's assets. Under section 6901(a), respondent may establish transferee liability if a basis exists under applicable State law for holding the transferee liable. Commissioner v. Stern, 357 U.S. 39, 42-47 (1958); Bresson v. Commissioner, 111 T.C. 172, 179 (1998), affd. 213 F.3d 1173 (9th Cir. 2000); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993), affd. and

remanded 958 F.2d 684 (6th Cir. 1992). Respondent bears the burden of proving that petitioner is liable as a transferee of the taxpayer. Sec. 6902(a); Gumm v. Commissioner, 93 T.C. 475, 479 (1989), affd. without published opinion 933 F.2d 1014 (9th Cir. 1991).

Respondent determined that petitioner is a transferee at law and in equity. Petitioner asserts two different defenses in this case in an attempt to avoid transferee liability. First, petitioner contends that the portion of the settlement proceeds transferred to him was his asset and that JCC was merely a conduit or recipient of the settlement proceeds for purposes of convenience. In other words, petitioner contends that the portion of the settlement proceeds received by him was not an asset of JCC or its subsidiaries and, accordingly, could not be "transferred" to him. Second, if we find that the proceeds belonged to the JCC conglomerate and that they were then transferred to petitioner, petitioner, in the alternative, contends that the transfer was for adequate consideration. Petitioner further contends that one of the JCC entities had an antecedent obligation to petitioner and that the transfer satisfied that obligation. We note that the question of transferee liability in this case is to be decided under the law of the State of Texas.

The first element about which the parties disagree concerns

whether there was a transfer of property; i.e., whether the property received by petitioner was from JCC (JCC's property as opposed to being due petitioner from the Westinghouse settlement). If the property was, in fact, JCC's, then we must decide whether there was adequate consideration for the transfer to petitioner.

The laws of the State of Texas provide for transferee liability under a modified form of the Uniform Fraudulent Transfer Act (TUFTA). TUFTA provides that a transferor engages in a transfer that is fraudulent as to a creditor if: (1) The transferor makes a transfer to a transferee; (2) the creditor has a claim against the transferor before the transfer is made; (3) the transferor makes the transfer without receiving reasonably equivalent value; and (4) the transferor is insolvent at the time of the transfer or is rendered insolvent as a result of the transfer. Tex. Bus. & Com. Code Ann. sec. 24.006(a) (Vernon 1987); Hanna v. Commissioner, T.C. Memo. 1999-292.

If all four elements of TUFTA section 24.006(a) are present, a creditor of the transferor (i.e., respondent) may recover from the transferee an amount equivalent to the lesser of the amount of the assets transferred to the transferee (reduced by the amount of assets or rights received by the transferor on the transfer, if any) or the amount of the creditor's claim. Tex. Bus. & Com. Code Ann. sec. 24.009(b), (d). If transferee

liability is established under State law, the transferee is liable for the transferor's taxes due as of the time of the transfer, as well as interest and any additions to tax, to the extent of the value of the assets transferred. See Estate of Glass v. Commissioner, 55 T.C. 543, 575 (1970), affd. 453 F.2d 1375 (5th Cir. 1972).

Petitioner argues that there was no transfer of property from JCC.[3] Petitioner maintains that the $286,737.27 he received from JCC was property he was entitled to receive directly from Westinghouse. Petitioner contends that $286,737.27 of the $1,050,000 settlement payment was in exchange for any claim petitioner may have had against Westinghouse. Specifically, petitioner asserts, in the context of this case, that Westinghouse damaged his business reputation and rendered him unable to borrow funds.

Petitioner's factual assertions are not supported by the record. There is no evidence that the settlement agreement was entered into to protect Westinghouse from a possible legal action by petitioner in his individual capacity. Prior to the default on the Westinghouse loan, JCC performed consulting duties in

---

[3] For purposes of this legal discussion, references to "JCC" are to JCC, the parent corporation, and all of JCC's wholly owned subsidiaries. We note that their returns were consolidated, and, hence, the disputed tax liability is consolidated. Factually and legally, there is no meaningful distinction to be made between any of the corporate entities linked by ownership to JCC or petitioner.

connection with West Mill.  In the negotiations preceding the settlement agreement, petitioner proposed to a representative of Westinghouse that Westinghouse pay JCC consulting fees of $1,050,000 for services related to Towne Lake.  His proposal to that effect is confirmed in a October 7, 1991, letter to petitioner that, in pertinent part, contains the following statement:

> This letter will confirm our conversation *  *  * with respect to a proposed settlement agreement between Westinghouse Credit Corporation ("WCC") and West Mill Joint Venture ("West Mill") regarding the New defaulted loans made in connection with the Towne Lake development in Georgia ("Towne Lake").
>
> WCC understands your proposal to be as follows:
>
> (i)  West Mill will provide WCC with a deed to Towne Lake in lieu of foreclosure;
>
> (ii) <u>Johnson Consolidated Companies</u> (guarantor of the Towne Lake loan and controlling stockholder of both West Mill venturers) <u>will enter into a consulting agreement with WCC and provide consulting services related to the operation and development of Towne Lake in exchange for consulting fees approximating One Million Fifty Thousand Dollars ($1,050,000)</u> on terms to be mutually agreed upon.  [Emphasis added.]

The settlement agreement, which mimics the above-quoted letter, provides for West Mill to convey the Towne Lake deed to Westinghouse in lieu of foreclosure and for Westinghouse to pay $1,050,000 directly to JCC.  There is no additional language in the agreement delineating or explaining the reason for the payment or the entities or individuals to whom the $1,050,000 was

to be distributed.

In that same vein, upon receipt, the entire $1,050,000 was deposited into JCC's bank account that was established for the sole purpose of receiving and, ultimately, distributing the settlement proceeds. Of the $1,050,000 received from Westinghouse, JCC paid $269,000 to The Johnson Corp. for management fees earned in conjunction with West Mill and $492,442 to F. Gardner Parker, Trustee. JCC transferred the remaining $286,737.27 to petitioner and recorded the transfer in its books as a payable due from petitioner.[4] Mr. Boswell, who had been working closely with petitioner as treasurer of The Johnson Corp. at the time of the settlement agreement, testified that JCC considered the $1,050,000 received from Westinghouse to be income to JCC. Likewise, JCC reported the $1,050,000 as income on its 1991 corporate income tax return.

Petitioner's contention that his individual participation in the settlement agreement is conclusive evidence of his rights to a portion of the settlement is unfounded. The JCC corporations entered into the settlement agreement to resolve claims concerning the outstanding and defaulted debt owed to Westinghouse. Petitioner was named as a party to the agreement in his individual capacity because he was a guarantor of the loan. The agreement identified and released petitioner as a

_____

[4] A nominal portion of the amount was used for administrative expenses.

guarantor.  It is obvious that if petitioner had not been a party to the agreement, he would have remained liable to Westinghouse for 50 percent of the unpaid debt and/or future claims by Westinghouse.  Accordingly, we hold that the $1,050,000 settlement was JCC's property and that JCC transferred a payment of $286,737.27 to petitioner.  Having decided that a transfer from JCC to petitioner occurred, we must now decide whether the transfer was for adequate consideration.

We now consider, under Texas law, whether JCC received reasonably equivalent value amounting to adequate consideration for the amount transferred.  See Tex. Bus. & Com. Code Ann. sec. 24.006(a) (West 1987); Gumm v. Commissioner, 93 T.C. at 480.

Respondent argues that petitioner received the transferred amount without consideration or for less than adequate consideration.  Petitioner argues that he was owed an antecedent debt and that the $286,737.27 payment was received in satisfaction of that debt.  A transfer that would otherwise result in transferee liability under section 6091(a) may be excepted from liability if the transfer was made for adequate consideration.  See Gumm v. Commissioner, supra.  A similar exception exists under TUFTA where the transferor receives "reasonably equivalent value" in exchange for the transfer.  See Tex. Bus. & Com. Code Ann. sec. 24.006(a) (West 1987).[5]  Under

---

[5] "Reasonably equivalent value" includes a transfer that is within the range of values for which the transferor would have
(continued...)

Texas law, payment in satisfaction of an antecedent debt may be adequate consideration in order to avoid transferee liability.

Respondent argues that the record does not contain documentary evidence of a debt.[6]  However, the preponderance of the evidence shows that, at the time of the transfer, there was a debt due petitioner from JCC.

Petitioner testified that he regularly advanced and received funds from his corporations.  Petitioner's uncontroverted testimony, was supported by the testimony of other witnesses.  Mr. Boswell testified that petitioner regularly advanced money to the corporation(s) to meet payroll and vendor obligations.  The testimony of Mr. Boswell was also uncontroverted.

In addition, documents in the record support and corroborate petitioner's testimony and that of Mr. Boswell.  JCC reported shareholder loans due to petitioner in returns of prior years, including the years ending June 30, 1988, and 1989.  Most significantly, petitioner reported $25,924 of imputed interest income from the corporation(s) on his 1991 individual income tax return.  On that point, Mr. Boswell testified that "there were no

_____

[5](...continued)
sold the asset in an arm's-length transaction.  The Texas UFTA includes in its definition of "value" an antecedent debt that the transfer satisfies.

[6] Respondent contends that his burden was satisfied because of petitioner's failure to offer documentary evidence of debt.  That contention alone would not make a prima facie showing with respect to transferee liability.  Ultimately, this issue has evolved into a factual and legal dispute about whether there was adequate consideration for the transfer.

notes created, but that interest income was imputed by the CPAs that prepared the returns on these due to/due from accounts."

Respondent counters petitioner's argument by noting that the $286,737.27 payment or transfer came from JCC and not the Johnson Corp., the subsidiary of JCC to which petitioner had advanced funds. JCC, however, was merely a holding company, and the Johnson Corp. and the other consolidated subsidiaries of JCC were the operating companies through which the corporate business was transacted. Significantly, the asserted transferee liability is for the consolidated JCC group, another factor that militates against respondent's argument.

Finally, it appears that the amount of interest income reported by petitioner quantitatively supports a $286,737.27 debt due to petitioner. If, for example, the $25,924 of interest income represented an interest rate of 10 percent, the amount due to petitioner would approximate $286,737.27.

On this record, petitioner has shown that there was a debt due him from the JCC corporation(s) at the time of the transfer. With that finding, we next consider whether the satisfaction of that debt due petitioner was "adequate consideration."

Under Texas law, "value" is given for a transfer if, in exchange for the transfer, property is transferred or an antecedent debt is satisfied. Tex. Bus. & Com. Code Ann. sec. 24.006(a)(Vernon 1987). Respondent argues that, even if JCC's payment satisfied an antecedent debt in an amount that was

reasonably equivalent to the transfer, as a matter of law the transfer was fraudulent under TUFTA section 24.006(b).

TUFTA provides that a transfer is fraudulent as to an insider who is also a creditor. In addition, if the creditor's antecedent debt arose before the transfer was made, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent, then the transfer is fraudulent as a matter of law. Tex. Bus. & Com. Code Ann. sec. 24.006(b)(Vernon 1987).

It is factually established in this case: That petitioner was an "insider" under Texas law; that JCC was insolvent at the time of the transfer; and that the transfer satisfied an antecedent debt. Respondent contends that petitioner knew of JCC's insolvency prior to the transfer so that the transfer was made in bad faith and represents the kind and type of "insider preference" that Tex. Bus. & Com. Code Ann. section 24.006(b) was designed to obviate.

Petitioner counters that section 24.009(f) provides for a statutory defense or exception to subsection (b). That exception occurs where a transfer was made in good faith in the "ordinary course of business or financial affairs" of the transferor/debtor and the insider. Tex. Bus. & Com. Code Ann. sec. 24.006(f)(2) (Vernon Supp. 2000).

In this case, although the transfer facially appears to meet the statutory threshold for an insider preference under section

24.006(b), it is nevertheless a "good faith" transfer under Texas law, because it was part of the usual business practices of JCC and petitioner.  Petitioner has shown by corroborated and uncontroverted evidence that the making of advances by petitioner for the corporation's payroll and vendor costs was part of the usual and regular business practice between the corporations and himself.  Accordingly, we hold that petitioner is not a transferee.

We have considered all other arguments advanced by the parties, and to the extent that we have not addressed these arguments, we consider them irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.